UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WELLESLEY REALTY ASSOCIATES, LLC,**
 Debtor

Chapter 11
Case No. 12-16889-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**WELLESLEY REALTY ASSOCIATES, LLC,**
 Plaintiff
v.
**TOWN OF WELLESLEY, MASSACHUSETTS,**
 Defendant

Adv. P. No. 14-1159

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

 The matters before the Court cross-motions for summary judgment with respect to

the Complaint filed by Wellesley Realty Associates, LLC (the "Debtor") pursuant to which

it seeks the following relief against the Defendant, the Town of Wellesley, Massachusetts (the

"Town"):

> to account for and turnover the property, a cash escrow account in the amount
> of approximately $222,000 of the Debtor's estate pursuant to 11 U.S.C. §§§ 542,
> 544(b)(1) & 547 namely, certain funds deposited with the Defendant . . . as
> refundable deposits in connection with the building permits for the
> construction project once owned by Wellesley Realty Associates, LLC at 978
> Worcester Road, Wellesley, MA, property of the debtor's estate at the time of
> filing.

1

On August 6, 2014, the Debtor filed a seven-count Complaint against the Town as

follows: Count I - Turnover of Property of the Estate pursuant to 11 U.S.C. §542; Count II -

Trust as Lien Creditor per 11 U.S.C. § 544(b)(1); Count III - Preference Recovery pursuant to

11 U.S.C. § 547; Count IV - Breach of Contract; Count V - Unjust Enrichment; Count VI -

Declaratory Judgment; and Count VII - Violation of the Automatic Stay pursuant to 11 U.S.C.

§362. The Debtor perfunctorily stated in its Complaint that this Court has subject matter

jurisdiction pursuant to "28 U.S.C. §§ 1331, 1334, and 2201," adding that "[t]his is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)." The Town neither conceded nor denied the

Debtor's jurisdictional assertions.

On March 6, 2015, the Debtor filed a "Motion for Partial Summary Judgment and, in

the Alternative, for Partial Summary Judgment as to Liability," seeking summary judgment

with respect to all counts of its Complaint as to liability and partial summary judgment as

to the issue of damages. In conjunction with its Motion, the Debtor filed a Memorandum and

a Concise Statement of Undisputed Material Facts and eight exhibits.        The Town, in

response, filed its own Motion for Summary Judgment, a Statement of Material Facts, six

exhibits, and a Memorandum in support of its Motion for Summary Judgment. It seeks

judgment in its favor on all counts of the estate. Both parties filed Oppositions and

Responses to their opponent's Memoranda and Statements of Material Facts.

The Court heard the cross-motions for summary judgment on April 9, 2015 and took

the matters under advisement. For the reasons set forth below, the Court concludes it lacks

jurisdiction under 28 U.S.C. §§ 157, 1334 to consider the merits of the Complaint. In the

alternative, the Court abstains from this proceeding pursuant to 28 U.S.C. § 1334(c)(1).

**II. FACTS**

    A. The Debtor's Bankruptcy Case[1]

    The Debtor filed a Chapter 11 petition on August 20, 2012. Dean Behrend ("Behrend"), the Debtor's manager, signed the petition.[2] Three creditors filed proofs of claim, including Drywall Services, Inc. with an unsecured claim in the sum of $27,756; Riverhead Building Supply Corp. with an allegedly secured claim in the sum of $21,039.13; and East West Bank with a partially secured claim up to the value of property located at 978 Worcester Road, Wellesley, Massachusetts, and 314 Glen Road, Weston, Massachusetts. The Debtor listed additional unsecured creditors on Schedule F-Creditors Holding Unsecured Nonpriority Claims, including KD Heating & Cooling with a claim of $13,000; Metro Sign Co. with a claim of $2,500; Newton Roofing with a claim of $2,000; and Starbro Electric with a claim of $18,000. All claims have been resolved through settlement, payment in full or by this Court's order dated October 29, 2014, sustaining the Debtor's objection to certain claims.

    The Debtor filed the above-captioned adversary proceeding against the Town on August 6, 2014. The Debtor is the former owner of a real estate development project located at 978 Worcester, Road, Wellesley, Massachusetts (the "Project" or the "Property"). East West

---

    [1] The Court may take judicial notice of its docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir.1999), *cert. denied*, 530 U.S. 1230 (2000) ("The bankruptcy court appropriately took judicial notice of its own docket.").

    [2] In its Statement of Financial Affairs, the Debtor listed Behrend as Manager with an 87% membership interest, and 869-873 Wellesley Street Realty Trust with a 13% membership interest.

Bank provided construction financing for the Project. On October 23, 2013, after obtaining

relief from the automatic stay, East West conducted a foreclosure sale at which time the

Property sold for $7,900,000.

As of the petition date, the Project was property of the Debtor's estate as set forth on

Schedule A-Real Property. The Debtor disclosed the following:

> Two Lots: located at 978 Worcester Road, Wellesley, MA, including fixtures in the
> building
> Front lot - 1.25 acres includes Commercial Building
> Back Lot - 1.25 acres premitted [sic] and design approved for 36 unit residential
> building
> Value: subject to further valuation and formal appraisal
> undeveloped parcel of land located at 314 Glen Road, Weston

The Debtor ascribed a value of $7.9 million to the Property, and, on Schedule D-Creditors

Holding Secured Claims, disclosed that East West Bank held a first mortgage in the sum of

$8.5 million. It ascribed a value of $2 million to the real estate located in Weston,

Massachusetts. On Schedule B-Personal Property, the Debtor did not disclose any deposits

or escrow accounts held by the Town. The Debtor, however, amended Schedule B on April

3, 2014, nineteen months after it filed its Chapter 11 petition and four months before

commencing the instant adversary proceeding, to list the following:

> Funds on deposit with the Town of Wellesley for traffic study        $30,000.00
>
> Funds on deposit with the Town of Wellesley for construction         $192,000.00
> [U]pon information and belief Town transferred the
> funds in July 2012 to the Town Planning Board.

The Debtor never identified the Town as a potential creditor on Schedule D, Schedule E-

Creditors Holding Unsecured Priority Claims, or Schedule F-Creditors Holding Unsecured

Non-Priority Claims. The Debtor did not list the Town as a party to a contract on Schedule

4

G-Executory Contracts and Unexpired Leases.  It also did not serve the Motion to Amend

Schedule B on the Town.

    The Debtor obtained confirmation of its Third Amended Plan of Reorganization on

August 20, 2014, approximately two weeks after it commenced the adversary proceeding

against the Town.  In its Third Amended Disclosure Statement, which it filed on May 15,

2014, the Debtor set forth the following with respect to its liquidating plan and its present

claims against the Town:

> In order to fund the settlement and the Plan, the Debtor still owns the property
> located at 314 Glen Road, Weston, Massachusetts, a 3 acre parcel in a very
> desirable area and the Bank holds a senior lien on this parcel per the
> Settlement Agreement. Debtor has received offers to purchase 314 Glen Road,
> Weston in excess of $1 million in addition, in the alternative, Debtor has
> pursued refinancing with a third party in order to make the payments under
> the Plan. Debtor is currently reviewing the offers and refinancing terms and
> intends on either (1) entering into a Purchase and Sale Agreement with one of
> the parties and immediately filing a Motion to Sell the property with the Court
> or (2) entering into a refinancing arrangement in order to obtain the required
> funds and will immediately file a motion for approval with the Court
> ("Financing Motion").  As will be further outlined in either the Sale Motion or
> Financing Motion, upon the closing of the sale/refinancing, Debtor intends to
> pay East West Bank the settlement amount ($500,000) and will deposit in
> escrow all remaining funds, which shall be sufficient to pay all outstanding
> allowed claims (. [sic] Debtor's counsel will act as Disbursing Agent and will
> use the funds to pay all outstanding administrative claims (approximately
> $75,000), any priority claims (Debtor believes there are real estate taxes owed
> in the approximate amount of $25,000), and a 100% distribution for all allowed
> general unsecured claims (approximately $60,000).  Any remaining funds will
> be paid to the holders of Debtor's membership interests.[3]

The Debtor also provided the following with respect to its claims against the Town:

---

    [3] The Debtor file an Expedited Motion for an Order Authorizing Postpetition
Financing on a First Priority Secured Basis with respect to the Glen Road property on
June 14, 2014.  The Court granted the Motion on June 24, 2014.

. . . Debtor's principal drained virtually all of his savings to keep the Debtor's project alive and placed a cash escrow payment of approximately $192,000 to the Town of Wellesley for the construction of one low income unit as part of the phase two building in the rear at 978 Worcester Street as well as an additional $30,000 for a traffic mitigation study related to 978 Worcester Road once that building reach [sic] 50% occupancy. The Town has since taken both escrowed amounts as the second phase of the projection was not commenced due directly to the events and actions of the Bank. Due to the foreclosure of the property by the Bank in October 2013, on March 27, 2014, Debtor's counsel sent a demand to the Town of Wellesley for the return of the funds as the Debtor asserts any new developer or subsequent buyer of the property from the Bank should be obligated to replace these funds. As of the date of this filing, the Town has refused to return the funds to the Debtor. If not resolved expeditiously, Debtor intends on filing an adversary proceeding against the Town of Wellesley for a return of the funds prior to any hearing on Confirmation of the Plan. *Debtor states that any pending adversary proceeding should not delay the confirmation of Debtor's Plan, as Debtor's Plan contemplates 100% distribution from the proceeds of the sale or refinance of Debtor's real property, not the outcome of any adversary proceeding.*

(emphasis supplied). Additionally, the Debtor disclosed the following with respect to

property of the estate:

Included in the assets re-vested with the Reorganized Debtor are all of the Debtor's causes of action and all choses in action. Under the Plan, all liens and claims with respect to such causes of action and choses in action, unless specifically preserved, will be discharged. All Causes of Action shall be prosecuted by the Debtor. As further described in this Disclosure Statement, Debtor intends on filing an adversary proceeding against the Town of Wellesley for the return of Debtor's funds.

In its Third Amended Plan of Reorganization, the Debtor set forth three classes of claims as

follows:

4.1 Class One (East West Bank). Class One is impaired. Class One claimant will receive $500,000 on or before July 15, 2014 in full satisfaction of its claims and liens and in accordance with the Settlement Agreement between the parties filed on April 15, 2014. Debtor anticipates using the funds from the sale or refinancing of 314 Glen Road, Weston, MA to fund the Settlement. Upon payment in accordance with the Settlement Agreement, East West Bank will

6

release any and all liens and claims on the 314 Glen Road property and the
Chapter 11 Estate.

4.2 Class Two (General Unsecured). Class Two is impaired. Under the terms
of the Plan, Class Two Claimants, general unsecured parties, will receive
payments equal to 100% percent of his/her/its Allowed Claim. The Debtor
estimates that the allowed unsecured claims will total approximately $60,000
and the Allowed Claimant will receive 100% of their allowed claim, *on the
Effective Date of the Plan from the proceeds of the sale or refinancing of Glen Road.*

***

Class Three (Equity Interests).  Class Three is impaired, inasmuch as Debtor's
outstanding member interests will receive excess proceeds from the sale and
adversary proceeding, if any, after payment in full of all administrative claims
and all allowed unclassified claims (Class One and Class Two claims).
Debtor's members will retain their interests in the Debtor.

The Debtor defined "Effective Date" in the plan as "sixty days after the Confirmation Order

becomes a Final Order, or, if such day is not a Business Day, the next succeeding Business

Day." Thus, the Effective Date was October 19, 2014 as the confirmation order entered on

August 20, 2014.  The plan also provided: "Except as otherwise provided in this Plan, all

property of the Debtor's bankruptcy estate shall vest in the Reorganized Debtor on the

Effective Date free and clear of all liens, claims, encumbrances and interests."[4]  In its Third

Amended Disclosure Statement, the Debtor disclosed the following with respect to Class

Three (Equity Interests):

Debtor's member interests will receive excess proceeds from the sale,
refinancing and/or adversary proceeding, if any, after payment in full of all

---

[4] Elsewhere, the plan similarly provided: "Re-vesting of Property. Except as
otherwise provided in this Plan, as of the Effective Date, Reorganized Debtor shall be
vested with all of the Debtor's property, free and clear of all claims, liens, encumbrances,
charges and other interests of holders of Claims against the Debtor."

administrative claims and all allowed unclassified claims (Class One and Class Two claims). Debtor's members will retain their interest in the Debtor.

In addition, the plan provided the following:

> *The Reorganized Debtor shall have the sole and exclusive right to bring, prosecute and settle any and all demands, rights and Causes of Action that the Debtor or the Estate may hold against any person or entity.* Debtor anticipates filing an adversary proceeding against the Town of Wellesley for recovery of the funds deposited with the Town for a traffic study and funds escrowed for a low-income housing unit. This cause of action is further described in Debtor's Disclosure Statement.
>
> Those claims arising from the rejection of executory contracts or unexpired leases, pursuant to 11 U.S.C. § 502(g) have until thirty (30) days from the authorized rejection by the Court to file their Proof of Claim.

(emphasis supplied). The certificate of service filed by the Debtor in conjunction with notice of the confirmation hearing did not contain the name and address of the Town.

As noted above, all claims were resolved on October 29, 2014. There have been no motions or other requests for relief on the main case docket filed by the Debtor or any other party in interest since that date.

B. The Wellesley Project

The Project consisted of one parcel on which two new buildings were to be constructed. The front building was to be a commercial building for use by office and retail tenants. The rear building was to be used for residential condominiums. The Debtor never commenced construction of the residential building, although it constructed the commercial building on the front portion of the lot.

On August 18, 2008, as required by the Town's Zoning Bylaw, the Town's Planning Board issued to the Debtor a Project of Significant Impact Special Permit Decision

8

("PSI-08-01").  The Project was described as follows:

> The project involves the redevelopment of a 2.35 acre (102,196 square feet) site
> at 978 Worcester Street.  Until 2008 there were 290,000 square feet of floor area
> on the site in two buildings, a motel with restaurant and a motel annex.  In
> June 2008 the motel building was demolished and removed from the site.  The
> project will involve clearing of the site and construction of a 36,000 square foot
> building at the rear of the lot for 36 residential condominiums and
> construction of a 24,000 square foot two-story commercial building with retail
> on the first floor and office space on the second floor.  There is no restaurant
> proposed.

Pursuant to the Decision, the Town conditionally granted the Debtor permission to construct

the Project.

PSI-08-01 contained a requirement that the Debtor deposit $30,000.00 (the "Traffic

Study deposit") in an Assignment and Bond fund to be held by the Town's Treasurer as

security for the performance of the traffic data monitoring and reporting obligations.  The

"Assignment and Bond" agreement was dated June 15, 2009 and required the Debtor to

complete all obligations provided for in the agreement before December 31, 2013.  It

specifically provided the following:

> Upon completion by the applicant of all said obligations prior to December 31,
> 2013,  (or such later date as may be specified by vote of the Planning Board
> with the written concurrence of the applicant), the remaining funds, after
> mitigation (if necessary) shall be returned to the applicant by the Town and
> this Assignment and Bond shall become void.  In the event the applicant
> should fail to have performed all said obligations by December 31, 2013, (or
> said mutually agreed upon later date) the funds on deposit in the account held
> by the Treasurer of the Town of Wellesley shall on said date be paid to the
> Town and the Planning Board shall thereafter expend said funds to the extent
> of the reasonable cost to the Town of completing said obligations.  The Town
> shall have the authorization to withdraw and apply the funds as required to
> fulfill the conditions specified above of the Project of Significant Impact
> Decision 08-01 signed August 18, 2008.  Any unused funds shall be returned
> to the applicant upon completion  of the work by the Town.

9

Pursuant to PSI-08-01, the Debtor received the permits for the Project with various conditions, including those relating to the traffic study. PSI-08-01, however, did not include any conditions relating to construction of affordable housing units. Nevertheless, section XVIB of the Town's Inclusionary Zoning Bylaw applied to "all projects requiring approval as Projects of Significant Impact under SECTION XVIA … and to single family residential subdivisions on sites having a development potential under current zoning of five or more lots" but did not apply to "any project undertaken by the Town for any municipal purpose." Pursuant to the Town's Bylaw Section XVIB, the Debtor was to provide one affordable housing unit in connection with the front building and eight affordable housing units in connection with the rear building.

Section C of the Inclusionary Zoning Bylaw requires on-site construction of affordable housing units in an amount to be determined by a formula based on total dwelling units and non-dwelling square footage. Section D of the Inclusionary Zoning Bylaw permits two alternatives to the requirement of Section C. First, the affordable units could be located off-site. Second, a cash contribution could be made to the Affordable Housing Trust fund as a "payment in lieu." Specifically, the Bylaw provides in pertinent part the following:

Assisted Units may be located on land within the Town of Wellesley other than on the project site; and/or

A cash contribution may be made to the affordable housing trust fund account established by the Wellesley Housing Development Corporation pursuant to Chapter 311 of the Acts of 1998 as a payment-in-lieu of providing the required ratio of Assisted Units on the project site. Moneys so deposited within such trust fund account shall only be used to provide Assisted Units within the Town according to the required ratio for that project . . . .

10

Section E of the Bylaw set forth how the cash contribution should be calculated.

Ms. Megan Jop ("Jop"), who testified at her deposition that she was the Town's former Planning Director and is present Deputy Director of General Government Services, explained that no special permitting was required for the Debtor's Project of Significant Impact with respect to the Inclusionary Zoning Bylaw. She stated:

> ... [T]here's also conditions relative to this project under inclusionary zoning. In this instance, it was initially a by right application of the inclusionary zoning because the units were being provided on site so there is no special permit for that, per se. . . .
>
> "By right" meaning that the inclusionary zoning bylaw as it stands requires that 20 percent of all residential units be constructed on site, and for commercial projects 2 percent per thousand square footage of floor area be constructed on site.
>
> Mr. Behrend proposed to construct those units on site, thus not requiring special permit.

Jop further explained that "[t]he zoning bylaw requires projects within this particular district, Business A, should they meet the PSI criteria, that they, in fact, would also trigger inclusionary zoning."

At the start of the Project, the Debtor intended to construct all the affordable housing units in the residential building on the rear portion of the lot. With respect to the Project and Inclusionary Bylaw, the Debtor was not required to build the eight affordable housing units unless construction on the back portion of the lot commenced, although it remained responsible for one affordable unit in connection with the front development.

In 2009, the Debtor requested a certificate of occupancy for the commercial building although it had not commenced construction of the residential building where the affordable

11

housing unit for the front commercial building would be located as required by the

Inclusionary Zoning Bylaw. According to the Debtor, construction of the building on the

front portion of the lot triggered the requirement to construct one affordable unit in

accordance with the Inclusionary Bylaw. The Town stated that it was the request for a

certificate of occupancy for the commercial building on the front of the lot that triggered the

requirement to construct the affordable unit. The parties' differing views are not material

as the Debtor sought an occupancy permit. Upon construction of the commercial building

on the front portion of the lot, the Town was aware that its Inclusionary Bylaw prohibited

the issuance of a certificate of occupancy unless, as noted above, the Debtor  (1) provided a

unit of affordable housing on site; or (2) requested a special permit to locate an affordable

unit off site: or (3) required the Debtor to make a payment in lieu.

On May 4, 2010, Michael D. Zehner, the Assistant Planning Director/ Acting Planning

Director, sent the Debtor a letter addressed to Behrend. The letter provided in pertinent part

the following:

> Please be advised that the Town of Wellesley Planning Board, at a regular
> meeting of the Board on May 4, 2010, considered and moved to accept the
> attached Irrevocable Standby Letter of Credit to satisfy the inclusionary zoning
> requirement to provide one (1) assisted unit required for the commercial
> portion of the project at 978 Worcester Street until July 1, 2011. . . .
>
> To finalize this matter, please provide the attached Letter of Credit with
> original signatures, the Letter of Credit "number", and the date of issuance. .
> . .

Thus, pursuant to the May 4, 2010 letter, the Debtor agreed to provide, and the Planning

Board agreed to accept, an irrevocable standby letter of credit in the amount of $180,275.00

in order to issue the Certificate of Occupancy.  The Letter of Credit was intended to secure

compliance with the Inclusionary Zoning Bylaw.  The Town issued a final Certificate of

Occupancy, dated May 14, 2010, to the Debtor for the Project's commercial building.

Behrend subsequently informed the Town that the Debtor wished to exchange the

letter of credit for cash in escrow so that the funds would earn interest.  Behrend also had

concerns about the stability of East West Bank which had issued the irrevocable letter of

credit.  Behrend indicated that the Debtor was involved in a dispute with the Bank which

was its lender.

On September 27, 2010, the Town and the Debtor executed an "Escrow Agreement

and Conditional Order to Pay" (the "Escrow Agreement").  The Agreement provided in

relevant part the following:

> Wellesley Realty Associates  . . . hereby deposits the sum of $180,275.00 to be
> retained in a separate interest bearing account designated as 89017500-489000-
> IZ978 with the Treasurer of the Town of Wellesley . . . as security for the
> performance of the obligations of the applicant as summarized herein relating
> to the project designated by the Planning Board as PSI-08-01 for a Project of
> Significant Impact (PSI) . . .
>
> Summarized, pursuant to said PSI decision the applicant is to provide 0.48%
> or (rounded up) 1 unit for the 24,000 square feet of commercial space being
> constructed on site in order to receive a Certificate of Occupancy.  Reference
> shall be made to said PSI decision for a complete description of the obligations
> . . .
>
> KNOW ALL PERSONS by these presents that the applicant hereby irrevocably
> binds and obligates themselves and their executors, administrators, devisees,
> heirs, successors, and assigns to the Town, acting through its Planning Board,
> in the sum of $180,275 and has secured this obligation by deposit of aforesaid
> funds with the Town.  The applicant has not yet completed the 36 unit
> residential structure of the project intended to provide that unit, thus a deposit
> of $180,275.00 has been calculated based on 0.48% of the difference in sales

13

price of an affordable unit ($214,428.00) and a market rate unit ($590,000.00) of
$375,572.00.

*This shall remain in full force and effect until the applicant has fully and satisfactorily
performed all said obligations.*

*Upon completion by the applicant of all said obligations* prior to July 1, 2011, (or
such later date as may be specified by vote of the Planning Board with the
written concurrence of the applicant), the remaining funds shall be returned
to the applicant by the Town and this ESCROW ASSIGNMENT AND
CONDITION ORDER TO PAY shall become void.  In the event the applicant
should fail to have performed all said obligations by July 1, 2011 [extended to
July 1, 2012] (or said mutually agreed upon later date) *the applicant hereby
ORDERS the funds on deposit in the account held by the Treasurer of the Town of
Wellesley shall on said date be paid to the Town and the Planning Board  shall
thereafter expend said funds to the extent of the reasonable cost to the Town of
completing said obligations.*  The Town shall have the authorization to withdraw
and apply these funds as required to fulfill the conditions.  Any unused funds
shall be returned to the applicant upon completion of the work by the Town.
It is agreed decisions by the Planning Board shall be final and binding on all
persons.

The Town acting by and through its Planning Board hereby agrees to accept
the aforesaid $180,275.00 deposit as security for the performance of all said
obligations.

The Treasurer of the Town of Wellesley hereby agrees not to release any funds
from the account or otherwise amend or make a change to the aforesaid
account without written agreement by the Planning Board.

Any amendments to this agreement and/or to the aforesaid security shall be
agreed upon in writing by all parties to this agreement.

(emphasis supplied).

Jop discussed three options available to the Debtor to obtain a certificate of occupancy,

namely provide one unit of affordable housing in the commercial building, request a special

permit to locate a unit off site, or to make a payment in lieu for the fractional unit needed to

satisfy the Inclusionary Zoning Bylaw.  She stated:

> The three options were presented to Mr. Behrend, and he selected that we move forward with proposing to make a payment in lieu intermittently until such time as he could complete the back building. . . . He posted surety for the fractional interest.

When asked if that was the same as a payment in lieu, Jop stated: "Well, it was - - no. In this instance, he was posting surety that he - - to open the building and that he intended to construct the unit in the back." She added: "A payment in lieu would have been that he had no intention of constructing the back unit. The surety, however, states that should he not complete the back building, then the payment in lieu obligation would be met."

According to the Debtor, the Town did not determine the amount of the Deposit in accordance with Paragraph E of its Inclusionary Bylaws, which sets forth the formula for determining the amount of a "payment in lieu" for affordable unit construction. The Town disagreed, indicating that it calculated the amount set forth in the Escrow Agreement deposit using the same methodology as the payment in lieu calculation in the Bylaw. Indeed, Jop testified during her deposition that the figure of $180,275 was determined as follows:

> [The developer] make[s] a payment in lieu based upon the median sale price of the - - -the Town take a look at projects currently on the market  - -  not projects; excuse me - - dwelling units currently on the market. they [sic] look at a six-month span for units and the approximate size of 1500 square feet. They [sic] take the median of that. They then take a look at what the LIP, the Local Initiative Program, regulations would require that particular unit to be sold at which will fluctuate based upon when, what time; same with the sale price. The difference, then, is the cost for the payment in lieu.
>
> ***
>
> That amount [$180,275] was determined based upon the example I previously gave you where they reviewed the sale prices for the past six months, determined what the LIP payment is for the affordable unit should it be sold, and took the difference thereof.

15

> The Town has recently done this with a project next door to Mr. Behrend, the
> CVS project, for the payment in lieu calculation as well.

Jop testified that the CVS project triggered the Inclusionary Zoning Bylaw and CVS made
a payment in lieu.

As noted above, the Debtor did not construct the required affordable housing unit by
the July 1, 2011 deadline.  Approximately eleven months after execution of the Escrow
Agreement, Jop advised the Debtor by letter dated August 15, 2011, that the Planning Board
had voted to extend the Escrow Agreement "for a portion of the Inclusionary Zoning
required for the 24,000 square foot building located at 978 Worcester Street for 12 months.
The new expiration date will be July 1, 2012."

The Debtor did not construct the affordable housing unit by July 1, 2012.  The Debtor
did not complete the Project; construction of the residential building never commenced.

On or around July 23, 2012, Jop again wrote the Debtor advising it that on July 16,
2012 the Planning Board had "voted unanimously to order the funds on deposit in account
89017500-489000-IZ978 held by the Treasurer of the Town of Wellesley, to be paid to the
Planning Board for security of the obligations of the applicant," namely "to provide 0.48%
or (rounded up) 1 unit of affordable housing as required by Section XVIB, Inclusionary
Zoning Bylaw for the construction of a 24,000 square foot commercial structure located at 978
Worcester Street pursuant to the Project of Significant Special Permit decision PSI-08-01."
In her letter, Jop further stated:

> PSI-08-01 permits the construction of a 36,000 square foot building at the rear
> of the lot located at 978 Worcester Street for 36 residential condominiums and

16

construction of a 24,000 square foot two-story commercial building with retail
on the first floor and office space on the second floor. The Inclusionary Zoning
requirement for this project is 7.2 or 8 units rounded up for the residential
building and 0.48 or rounded up 1 unit for the commercial building.

The original Escrow Agreement and Conditional Order to Pay was created to
allow the commercial building to receive a Certificate of Occupancy, while the
real residential building was constructed. The agreement was scheduled to
expire on July 1, 2011. The Planning Board voted to extend said agreement on
July 11, 2011 to July 1, 2012. Given the financial difficulties and uncertanty of
the project, the Planning Board must insure the obligations to the Town are
completed and will not further extend the agreement. Should the project move
forward in the future and the 36 residential units proposed for construction on
the rear of the site be completed, if the affordable unit required for the 24,000
square foot commercial structure can be accommodated on site, the Planning
Board would discuss reinstituting a new agreement.

According to the Debtor, the Town learned in July of 2012 that its lender, East West

Bank, was intending to foreclose on the Project. The Town admitted that it knew about the

pending foreclosure sale when it sent the Debtor its July 23, 2012 letter in which it stated that

the Wellesley Planning Board had voted to order the $180,275.00 escrow deposit, held by the

Town Treasurer, to be paid to the Planning Board. It also indicated that it learned of the

Debtor's bankruptcy filing, which occurred on August 20, 2012, within weeks of sending the

letter. The Town denied receiving formal notice of the filing of the bankruptcy petition.

Thereafter, according to the Debtor, the Town took the funds held pursuant to the

September 27, 2010 Escrow Agreement from the escrow account. The Town admitted that its

Treasurer moved the $180,275.00 deposit to an account controlled by the Town Planning

Board prior to the Debtor's bankruptcy petition due to the Debtor's failure to meet the

obligations outlined in the Escrow Agreement. The Town is still holding, and has not

expended, the funds; the Town also is still holding, and has not expended any of the Traffic

17

Study deposit. According to Jop, an article was to be presented at the 2014 annual Town meeting for authority to transfer the funds that were in the Escrow Agreement to the Wellesley Housing Development Corporation to fulfill the Debtor's inclusionary zoning obligation, but the Town did not move for that authorization due to the Debtor' pending bankruptcy case.

As noted above, in October of 2013, Debtor's lender foreclosed on a portion of the Project, and, in January of 2014, the Debtor's lender foreclosed upon the remainder of the Project and took title to the entire Project. The Debtor no longer owns an interest in the Project. The Project is currently under the control of a developer other than the Debtor.

According to the Debtor, the permits associated with the Project are still valid as a result of Massachusetts' Permit Extension Act.[5] The Town admitted the permits were

---

[5] According to the official website of the Executive Office of Energy and Environmental Affairs relative to the Permit Extension Act,

On August 4, 2010 the Massachusetts legislature passed an "Act Relative to Economic Development and Reorganization" that the Governor signed into law the next day. The law became effective immediately with the Governor's signature on August 5th.

The complete text of the law, including the Permit Extension Act, section 173, can be found on the Massachusetts Legislature's website. Section 173 can be found on page 120 of the Permit Extension document. The Executive Office of Energy & Environmental Affairs has developed a Frequently Asked Questions webpage to address many of the most common questions about the Act.

The permit extension provision is as follows:

SECTION 173: Notwithstanding any general or special law to the contrary, certain regulatory approvals are hereby extended as provided in this

18

section.

(a) For purposes of this section, the following words shall, unless the
context clearly requires otherwise, have the following meanings:

"Approval" except as otherwise provided in subsection (b), any permit,
certificate, order, excluding enforcement orders, license, certification,
determination, exemption, variance, waiver, building permit, or other
approval or determination of rights from any municipal, regional or state
governmental entity, including any agency, department, commission, or
other instrumentality of the municipal, regional or state governmental
entity,concerning the use or development of real property, including
certificates, licenses, certifications, determinations, exemptions, variances,
waivers, building permits, or other approvals or determination of rights
issued or made under chapter 21, chapter 21A excepting section 16, chapter
21D, sections 61 to 62H, inclusive, of chapter 30, chapters 30A, 40, 40A to
40C, inclusive, 40R, 41, 43D, section 21 of chapter 81, chapter 91, chapter
131, chapter 131A, chapter 143, sections 4 and 5 of chapter 249, or chapter
258, of the General Laws or chapter 665 of the acts of 1956, or any local
by-law or ordinance.

"Development", division of a parcel of land into 2 or more parcels, the
construction, reconstruction, conversion, structural alteration, relocation or
enlargement of a building or other structure or facility, or any grading, soil
removal or relocation, excavation or landfill or any use or change in the use
of any building or other structure or land or extension of the use of land.

"Tolling period", the period beginning August 15, 2008, and continuing
through August 15, 2012.

(b) (1) Notwithstanding any general or special law to the contrary, an
approval in effect or existence during the tolling period shall be extended
for a period of 2 years, in addition to the lawful term of the approval.

(2) Nothing in this section shall be deemed to extend or purport to extend:

(i) a permit or approval issued by the government of the United States or an
agency or instrumentality of the government of the United States or to a
permit or approval, of which the duration of effect or the date or terms of its
expiration are specified or determined by or under law or regulation of the

19

federal government or any of its agencies or instrumentalities;

(ii) a comprehensive permit issued by a board of appeals under sections 20 to 23, inclusive, of chapter 40B of the General Laws; or;

(iii) a permit, license, privilege or approval issued by the division of fisheries and wildlife under chapter 131 for hunting, fishing or aquaculture.

(3) Nothing in this section shall affect the ability of a municipal, regional or state governmental entity, including an agency, department, commission or other instrumentality of a municipal, regional or state governmental entity to revoke or modify a specific permit or approval or extension of a specific permit or approval under this section, when that specific permit or approval or the law or regulation under which the permit or approval was issued contains language authorizing the modification or revocation of the permit or approval.

(4) In the event that an approval tolled under this section is based upon the connection to a sanitary sewer system, the approval's extension shall be contingent upon the availability of sufficient capacity, on the part of the treatment facility, to accommodate the development whose approval has been extended. If sufficient capacity is not available, those permit holders whose approvals have been extended shall have priority with regard to the further allocation of gallonage over those approval holders who have not received approval of a hookup prior to the effective date of this section. Priority regarding the distribution of further gallonage to a permit holder who has received the extension of an approval under this section shall be allocated in order of the granting of the original approval of the connection.

(5) In the case when an owner or petitioner sells or otherwise transfers a property or project, in order for an approval to receive an extension, all commitments made by the original owner or petitioner under the terms of the permit must be upheld by the new owner or petitioner. If the new owner or petitioner does not meet or abide by those commitments then the approval shall not be extended under this section.

(6) Nothing in this section shall be construed or implemented in such a way as to modify a requirement of law that is necessary to retain federal delegation to, or assumption by, the commonwealth of the authority to implement a federal law or program.

20

subject to the Act.  Again, according to the Debtor (and without citation to authority), the current developer is required to perform the conditions and obligations of the permit as originally issued to the Debtor, but the Town has not required the current developer to adhere to the affordable housing unit obligations arising from the construction of the commercial building.   Neither party pointed to evidence that would require the new developer to fulfill the Debtor's obligations under PSI-08-01, although the Town stated: "The permit runs with the land."

The current developer has not placed any funds in escrow to satisfy the PSI -08-01 requirements, the affordable housing unit, or the traffic mitigation study, and the Town has not required the current developer to place funds into either an escrow agreement or to obtain a bond to satisfy the PSI requirements, the Inclusionary Zoning Bylaw, or the traffic mitigation study.  The Town agreed, stating that the obligations under the initial permit had been fulfilled.  According to the Debtor, the Town has not undertaken any efforts to satisfy the Debtor's obligations under the Escrow Agreement or traffic mitigation study and has not utilized any of the Deposit to complete the Debtor's obligations under the escrow agreement. The Town disagreed, stating that it has taken the funds in the Escrow Agreement as a payment in lieu because the Debtor failed to adhere to its obligation to provide for an affordable housing unit for the commercial construction portion of the Project.  The Town admitted it has not used the money, but reiterated its view that retention of the $180,275 is due to the Debtor's failure to complete its obligations under the Escrow Agreement.

21

The Town disputed the Debtor's factual assertion that it does not intend to build the affordable housing unit. It represented that the Debtor's obligation to build an affordable housing unit was satisfied when the Town took the funds held pursuant to the Escrow Agreement, stating that it intended to transfer the funds for inclusionary housing to the Wellesley Housing Development Corporation to fulfill the inclusionary zoning obligation. It did not do so after the Debtor filed its bankruptcy petition. Although the Town and the Debtor entered into the Escrow Agreement with respect to the deposit, the Town referred to its action of taking the deposit as "calling the bond" and as satisfying the obligation to construct the affordable housing unit. The Town stated that "calling the bond" is the vernacular used in email exchanges to describe the affordable housing unit required by the Inclusionary Zoning Bylaw for the commercial component of the Project.

The Debtor contended that the Town does not intend to repay the deposit or any portion thereof. The Town stated:

Disputed that the Town does not intend to repay (assuming that the Deposit referred to is the $180,275 for affordable housing), but undisputed that it is unlikely. The Town intends to return any unused funds to the applicant upon completion of the work by the Town.

According to the Debtor, the Town's failure to undertake any efforts to complete the Debtor's obligations, refusal to return any of the deposit to the Debtor, and treatment of the deposit as a payment in lieu, is contrary to the express terms of the parties' Escrow Agreement. The Town stated that the terms of the Escrow Agreement are clear and provide no deadline for any required Town efforts. The Town also disputed that it admitted that the Escrow Funds posted by the Debtor were not, in fact, a "payment in lieu" citing the following testimony by

22

Jop:

> Q. Is that the same as a payment in lieu?
> A. Well, it was -- no. In this instance, he was posting surety that he -- to
> open the building and that he intended to construct the unit in the back. A
> payment in lieu initially would have been that he had no intention of
> constructing the back unit. The surety, however, states that should he not
> complete the back building, that then that payment in lieu obligation
> would be met.
> Q. And when you are referring to a document that states that, can you
> describe that document?
> A. That is the escrow agreement and conditional order to pay. The escrow
> agreement established that while the Town was awaiting construction of
> the rear building, in efforts to give the certificate of occupancy to the front
> building a surety was placed in escrow. Should by a specific date Mr.
> Behrend not construct the rear building, the Town in efforts to fulfill
> that .48 [sic] obligation would receive the funds.

On or about March 25, 2014, the Debtor, through counsel, requested the return of the

funds which had been held pursuant to the Escrow Agreement and the Traffic Study deposit.

The Debtor asserted that the Town refused to return the Traffic Study deposit or the funds

which had been held in escrow, treating the formally escrowed funds as a payment in lieu,

contrary to the terms of the parties' agreements.

The Town neither obtained relief from the automatic stay to exercise possession

and/or control over property of the Debtor's estate nor to setoff funds pursuant to 11 U.S.C.

§ 553, although the Debtor did not list it on its creditor matrix or serve it with notice of its

motion to amend Schedule B, or with notice of hearings with respect to its disclosure

statements and plans. The Town admitted that it did not obtain relief from the automatic

stay, but disputes that it took any action against any funds in contravention of the automatic

stay. The Town has not filed a proof of claim and the deadline within which to do so has

23

expired. It has not asserted any claim for damages or any right to setoff or for recoupment.

## III. DISCUSSION

### A. Jurisdiction

Neither party addressed this Court's jurisdiction to resolve the Debtor's Complaint.

This Court has an independent duty to determine its jurisdiction, particularly where, as here,

the Debtor's Third Amended Plan of Reorganization has been substantially consummated.[6]

---

[6] In Gray v. Polar Molecular Corp. (In re Polar Molecular Corp.), 195 B.R. 548
(Bankr. D. Mass. 1996), this Court observed:

Although substantial consummation and the reduction of jurisdiction are
concomitant, substantial consummation alone does not divest this Court of
jurisdiction. The Code defines substantial consummation in section 1101 as
follows:

In this chapter—

(2) "substantial consummation" means—

(A) transfer of all or substantially all of the property proposed
by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor
under the plan of the business or of the management of all or
substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).   195 B.R. at 554.  This Court added:

"Substantial consummation" is a defined term which relates, *inter alia*, to
one of several grounds for dismissal under § 1112(b) of the Code. The
District Court in Terracor, 86 B.R. at 676 n.12, distinguished
"consummation" of a plan from "substantial consummation," noting that
"[c]onsummation of a plan involves many different acts, one of which is the
'substantial consummation' of a plan." The Terracor court found that it

24

As the court in <u>First Guaranty Bank & Trust Co. v. Reeves</u>, 86 F.Supp.2d 1147 (M.D. Fl. 2000),

recognized:

> Because the subject matter jurisdiction of a federal court is constitutional and
> statutory in nature, it cannot be waived or otherwise conferred upon the court
> by the parties. <u>University of South Ala. [v. American Tobacco Co.]</u>, 168 F.3d
> [405] at 410 [(11th Cir. 1999)]. *See also* <u>Hurt v. Dow Chemical Co.</u>, 963 F.2d 1142,
> 1146 (8th Cir.1992) ("subject-matter jurisdiction is not a mere procedural
> irregularity capable of being waived"). Even if neither of the parties objects to
> a court's subject matter jurisdiction, the court may — indeed should — inquire
> into its jurisdiction *sua sponte* whenever it maybe lacking. 168 F.3d at 410.

<u>Reeves</u>, 86 F.Supp.2d at 1150 (emphasis added). *See also* <u>Commonwealth of Mass. v. Sohmer</u>

<u>(In re Sohmer)</u>, 388 B.R. 448, 452 (Bankr. D. Mass. 2008).

Sections 157 and 1334 of title 28 and the order of reference from the United States

District Court for the District of Massachusetts, LR, D. Mass. 201, govern this Court's

jurisdiction, providing that "district courts shall have original but not exclusive jurisdiction

of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

28 U.S.C. § 1334(b). As noted by the court in <u>In re Insilco Techs., Inc.</u>, 330 B.R. 512, 525

(Bankr. D. De. 2005), "[t]he jurisdictional statutes apply without differentiating between

liquidating and reorganizing debtors." In <u>Resorts Internat'l Fin., Inc. v. Price Waterhouse &</u>

<u>Co. (In re Resorts Internat'l Inc.)</u>, 372 F.3d 154 (3d Cir. 2004), the United States Court of

Appeals for the Third Circuit held that post-confirmation "related to" jurisdiction lies only

if the matter at issue affects the interpretation, implementation, consummation, execution,

---

> retained jurisdiction because the plan had not been "*fully* consummated."
> <u>Id.</u> at 554-55 (citing <u>In re Terracor</u>, 86 B.R. 671, 676 (D. Utah 1988)).

25

or administration of a confirmed plan.[7]  In <u>In re Premium Escrow Servs., Inc.</u>, 342 B.R. 390

(Bankr. D. Dist. Col. 2006), the court explained:

> Prior to the confirmation of a debtor's plan of reorganization, an action to
> recover funds for the estate easily satisfies the criteria for "related to"
> jurisdiction because the recovery of such funds increases the size of the estate
> and improves the potential for and quantity of distributions to creditors. But
> "once confirmation occurs, the bankruptcy court's jurisdiction shrinks,"
> <u>Penthouse Media Group v. Guccione (In re Gen. Media, Inc.)</u>, 335 B.R. 66, 73
> (Bankr. S.D.N.Y.  2005), because "[a]t the most literal level, it is impossible for
> the bankrupt debtor's estate to be affected by a post-confirmation dispute"
> once the estate re-vests in the reorganized debtor pursuant to 11 U.S.C. § 1141.
> <u>Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)</u>, 372 F.3d 154,
> 165 (3d Cir.2004).

342 B.R. at 396 (footnote omitted).[8]  According to the court in <u>In re Equip. Finders, Inc. of</u>

_____

[7]  The Third Circuit stated:

> T]he potential to increase assets of the Litigation Trust and its beneficiaries
> does not necessarily create a close nexus sufficient to confer "related to"
> bankruptcy court jurisdiction post-confirmation. The Trust beneficiaries
> here no longer have the same connection to the bankruptcy proceeding as
> when they were creditors of the estate. For reasons they believed financially
> prudent, they traded their creditor status as claimants to gain rights to the
> Litigation Trust's assets. Thus, their connection to the bankruptcy plan or
> proceeding is more attenuated. Furthermore, if the mere possibility of a
> gain or loss of trust assets sufficed to confer bankruptcy court jurisdiction,
> any lawsuit involving a continuing trust would fall under the "related to"
> grant. Such a result would widen the scope of bankruptcy court jurisdiction
> beyond what Congress intended for non-Article III bankruptcy courts.

<u>In re Resorts Internat'l, Inc.</u>, 372 F.3d at 170

[8] The court also stated:

> "Consequently, a party invoking the bankruptcy court's post-confirmation
> jurisdiction must satisfy two requirements." <u>In re Gen. Media, Inc.</u>, 335 B.R.
> at 73. "First, the matter must have a close nexus to the bankruptcy court or
> proceeding, as when a matter affects the interpretation, implementation,

Tenn., 473 B.R. 720 (Bankr. M.D. Tenn. 2012), "[m]ost decisions agree that 'related to' jurisdiction requires more than a vague notion that litigation might increase a dividend to creditors under the plan." Id. at 732 (citing Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d at 1194 and n.1, a case in which the court rejected the argument that there is a close nexus when the proceeding could conceivably increase the recovery to creditors. ). In In re Gen. Media, Inc., the court stated that "[b]ankruptcy courts plainly lack subject matter jurisdiction over post-confirmation litigation where the case has been fully administered and all of the recovery will go to the reorganized debtor rather than to the creditors." 335 B.R. at 75. The rationale in General Media would apply in the instant case, where property has vested in the reorganized debtor and unsecured creditors were paid 100% of their claims on the Effective Date or following the claims objection process which concluded on October 29, 2014 when this Court sustained the Debtor's objections to claims.

As noted by the court in General Media,

> unless the plan says something different, confirmation vests the property of the estate in the reorganized debtor. 11 U.S.C. § 1141(b). The estate comes to an end, and ceases to exist. Craig's Stores, 266 F.3d at 390; Fairfield Communities, Inc. v. Daleske (In re Fairfield Communities, Inc.), 142 F.3d 1093, 1095 (8th Cir.1998); Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.), 272 B.R. 74, 97–98 (Bankr. S.D.N.Y.2002). Accordingly, the outcome of a

consummation, execution[,] or administration of the confirmed plan[,] and second, the plan must provide for the retention of jurisdiction over the dispute." Kassover v. Prism Venture Partners, LLC (In re Kassover), 336 B.R. 74, 79 (Bankr.S.D.N.Y.2006). "At the post-confirmation stage, the claim must affect an integral aspect of the bankruptcy process—there must be a close nexus to the bankruptcy plan or proceeding." In re Resorts Int'l, Inc., 372 F.3d at 167.

post-confirmation proceeding cannot affect the estate. <u>Resorts Int'l</u>, 372 F.3d
at 165.

<u>In re General Media, Inc.</u>, 335 B.R. at 75.  Thus, 11 U.S.C. § 542(a) would be inapplicable
because there is no longer a trustee (or debtor-in-possession) to whom property can be
delivered and the estate cannot benefit. <u>Id.</u>

In <u>Reynolds v. Boston Reg'l Med. Cntr. (In re Boston Reg'l Med. Cntr.)</u>, 410 F.3d 100
(1st Cir. 2005), however, the First Circuit affirmed the bankruptcy court's conclusion that it
had "related-to" jurisdiction, stating "[w]hether or not BRMC [Boston Regional Medical
Center] prevails will directly affect the amount of the liquidating dividend paid to creditors.
There is, therefore, a fairly close connection between the adversary proceeding and the
administration of the bankruptcy estate. That seemingly would suffice to bring this case
within the bankruptcy court's related to jurisdiction." <u>Id.</u> at 105 (citing <u>In re Toledo</u>, 170 F.3d
1340, 1345–46 (11th Cir.1999) (finding related to jurisdiction when the outcome of the suit
would affect the amount of funds available to creditors).  The First Circuit, distinguishing
between liquidating and "true reorganization" plans,  added:

> Typically, a reorganized debtor is attempting to make a go of its business.
> Thus, its actions (including any involvement in litigation) redound primarily
> to that end and only affect the underlying bankruptcy proceeding in a
> tangential or derivative way. By contrast, a liquidating debtor exists for the
> singular purpose of executing an order of the bankruptcy court. Any litigation
> involving such a debtor thus relates much more directly to a proceeding under
> title 11.
>
> This case is a paradigmatic example: L–BRMCs success or lack of success in
> securing a share of the trust corpus will directly impact the amount of the
> liquidating dividend eventually paid to BRMC's creditors. That is a matter
> intimately connected with the efficacy of the bankruptcy proceeding.

28

In re Boston Reg'l Med. Cntr., 410 F.3d at 105 (citation omitted, footnote omitted).

    In In re General Media, Inc., the Court observed that "the distinction between core and

non-core jurisdiction may not be particularly relevant after confirmation," 335 B.R. at 75,

adding that "[a]lthough the cases generally focus on "related to" post-confirmation

jurisdiction, the scope of the post-confirmation jurisdiction mapped out by the case law

usually meets the definition of a core proceeding. Broadly speaking, the proceeding must

affect some aspect of the plan—its meaning, its implementation or its consummation—to

come within the Court's post-confirmation jurisdiction." Id. The court also noted that "[b]y

definition, plan-related matters arise only in the context of a chapter 11 bankruptcy case."

It concluded, however, that "even if the proceeding is core, its outcome must still affect the

Plan."Id. The court's observation is consistent with Gray v. Polar Molecular Corp. (In re

Polar Molecular Corp.), 195 B.R. 548 (Bankr. D. Mass. 1996), in which this Court

noted that "[a]s the terms of a plan of reorganization are fulfilled, there are necessarily fewer

plan issues which might arise. At the point of substantial consummation, many of a plan's

provisions will have been carried out. For this reason, simple logic dictates that at this stage

in a reorganization the bankruptcy court's post-confirmation jurisdiction is reduced." 195

B.R. 555. This Court recognized, however, that a narrow view of post-confirmation

jurisdiction would render the distinction between sections 1112(b)(7) and 1112(b)(8)

meaningless. Id. at 555 n.2.

    In Polar Molecular, the Chapter 11 trustee brought an action to recover estate funds

for distribution to unsecured creditors pursuant to the debtor's confirmed plan, based upon

29

its alleged improper calculation of gross margin. This Court denied in part the debtor's motion to dismiss, finding that "Trustee states a cause of action to enforce the Plan and that resolution of the issues raised by the Complaint will directly affect the amount of supplemental dividends to be distributed to the unsecured creditors." 195 B.R. at 555-56. The Court added that "the issues raised by the Complaint arise under § 1142 of the Code and that they fall well within the jurisdictional grant of § 1334 as a proceeding "arising under" title 11 and "arising in or related to" a case under title 11." Id. at 555-56.

The present case is distinguishable from Polar Molecular. Here, there will be no effect on the bankruptcy estate or distributions to creditors. Property of the estate vested in the Debtor and all claims were settled or paid in full at the Effective Date. Accordingly, the Court concludes that it lacks jurisdiction with respect to the adversary proceeding commenced by the Debtor against the Town. As is evident from the Debtor's Third Amended Disclosure Statement and Third Amended Plan of Reorganization, the only two classes of creditors were to be paid in full from the refinancing of property of the estate on or before the Effective Date. The Effective Date has passed. Accordingly, pursuant to the Debtor's plan only the members of the Reorganized Debtor will benefit from any recovery from the Town.[9]

As a final point, the Debtor's plan provided that this Court would retain jurisdiction over the pending dispute. Federal courts, however, are courts of limited jurisdiction, and

---

[9] The Court notes that where the plan did not provide for interest on the claims of the two classes of creditors, the absolute priority rule may be implicated.

30

"'neither the bankruptcy court nor the parties can write their own jurisdictional ticket.'" In

re General Media, Inc., 335 B.R. at 75 n.8 (quoting Resorts Int'l, 372 F.3d at 161). *See also*

Poplar Run Five Ltd. P'ship v. Virginia Elec. & Power Co. (In re Poplar Run Five Ltd. P'ship),

192 B.R. 848, 859 (Bankr. E.D. Va. 1995); Grimes v. Graue (In re Haws), 158 B.R. 965, 969

(Bankr. S.D. Tex. 1993).

    B. Abstention

    Even if this Court were to conclude that it is bound by the decision in In re Boston

Reg'l Med. Cntr., and find that it has jurisdiction because the adversary proceeding was

commenced before confirmation of the Third Amended Plan of Reorganization, this Court

would abstain from determining the merits of this adversary proceeding.   The Debtor's

Complaint which includes turnover of "property of the estate," implicates a number of

issues, including 1) whether the Escrow Agreement and Assignment and Bond Agreements

contain funds that were property of the estate in view of the terms of the provisions of the

agreements; 2) whether the Escrow Agreement and Assignment and Bond agreement were

executory contracts that were rejected by operation of law as the Debtor did not assume the

contracts prior to confirmation of its Third Amended Plan of Reorganization, *see* 11 U.S.C.

§ 365(d)(2); 3) whether the Debtor is estopped from seeking recovery of the deposits where

it failed to list the Town as a contingent creditor with a potential claim against the estate;

failed to notify it of its claim to the deposits in conjunction with its Motion to Amend

Schedule B filed in April of 2014, approximately 19 months after the commencement of the

case; and did not provide it with notice of the hearings on approval of disclosure statements

31

and confirmation of the Third Amended Plan of Reorganization; and 4) whether the Debtor

is estopped from seeking damages for violation of the automatic stay where it did not list the

Town as a creditor, contingent or otherwise, or interests in the deposits until 19 months after

the commencement of the case.

In In re AK Servs., Inc., 159 B.R. 76 (Bankr. D. Mass. 1993), this court set forth the

following factors with respect to a court's decision to voluntarily abstain pursuant to 28

U.S.C. § 1334(c)(1):

> (1) the effect or lack thereof on the efficient administration of the estate if a
> Court recommends abstention, (2) the extent to which state law issues
> predominate over bankruptcy issues, (3) the difficulty or unsettled nature of
> the applicable state law, (4) the presence of a related proceeding commenced
> in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any,
> other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the
> proceeding to the main bankruptcy case, (7) the substance rather than form of
> an asserted "core" proceeding, (8) the feasibility of severing state law claims
> from core bankruptcy matters to allow judgments to be entered in state court
> with enforcement left to the bankruptcy court, (9) the burden of . . . [the] . . .
> docket, (10) the likelihood that the commencement of the proceeding in
> bankruptcy court involves forum shopping by one of the parties, (11) the
> existence of a right to a jury trial, and (12) the presence in the proceeding of
> nondebtor parties.

159 B.R. at 80 (citing In In re Republic Reader's Serv., Inc., 81 B.R. 422, 429 (Bankr. S.D. Tex.

1987)).

Application of the factors set forth above supports abstention. Recovery of the funds

will not affect the administration of the bankruptcy estate because the Debtor's Third

Amended Plan of Reorganization has been substantially consummated and any recovery will

inure to the members of the Debtor, not creditors of the bankruptcy estate who have been

paid in full. As noted above, property of the estate has vested in the reorganized debtor and

the bankruptcy estate has ceased to exist. <u>Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.)</u>, 266 F.3d 388, 390 (5th Cir. 2001); <u>General Media</u>, 355 B.R. at 74.

In addition, state law issues predominate. While the parties mentioned the Permit Extension Act, they did not address how or why it would apply to PSI 08-01. Neither party explored the issue of whether the unidentified new developer succeeded to the Debtor's interests in the deposits or to its obligations to perform a traffic study and provide an affordable housing unit. Specifically, the Debtor did not set forth legal grounds for its assertion that the present owner of the property would be responsible for compliance with the Inclusionary Zoning Bylaw.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter an order dismissing the adversary proceeding for lack of jurisdiction. In the alternative, the Court shall voluntarily abstains from determining the merits of the adversary proceeding.

By the Court,

Joan N. Feeney

Joan N. Feeney
United States Bankruptcy Judge

Dated: May 11, 2015

33